## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MICHAEL O'DONNELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action File** |
| **v.** | ) | **No. 1:17-cv-03656-SCJ-JCF** |
| | ) | |
| **AKAL SECURITY, INC., and** | ) | |
| **THE UNITED STATES MARSHALS** | ) | |
| **SERVICE, by and through** | ) | |
| **JEFF SESSIONS, U.S. ATTORNEY** | ) | |
| **GENERAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff Michael O'Donnell ("Mr. O'Donnell"), by and through undersigned counsel, and files this First Amended Complaint against Defendants Akal Security, Inc. ("Akal") and the United States Marshals Service ("USMS"), by and through Jeff Sessions, U.S. Attorney General (collectively, "Defendants"), showing the Court as follows:

## INTRODUCTION

1.

The instant action arises from Defendants' violations of Mr. O'Donnell's

rights under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and various state law claims.

2.

As more particularly described below, Defendants have unlawfully retaliated against Mr. O'Donnell, in violation of Title VII, by depriving Mr. O'Donnell of equal employment opportunities and taking certain adverse actions against him as a result of Mr. O'Donnell's participation in protected reporting activity. As a result of these violations, Mr. O'Donnell seeks compensatory and punitive damages, attorneys' fees and costs, and all other just and equitable relief available under Title VII, and applicable state law.

## PARTIES, JURISDICTION, AND VENUE

3.

Defendant Akal Security, Inc. is a New Mexico corporation which is registered to transact business in the State of Georgia and can be served through its Georgia Registered Agent, Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Georgia 30092.

4.

Defendant the United States Marshals Service is an agency of the United States and can be served by sending copies of the summons and complaint by

certified mail to the civil-process clerk at the United States Attorney's Office and to the Attorney General of the United States, Jeff Sessions.

5.

Michael O'Donnell is an individual and a resident of the State of Georgia.

6.

As indicated in the initial Complaint [Doc. 1], Mr. O'Donnell timely filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC").  The EEOC mailed the Notice of Right to Sue letter on January 23, 2018, and Mr. O'Donnell has timely filed this suit.  The facts of the EEOC charge were properly pled in the initial Complaint [Doc. 1], but in an abundance of caution, Mr. O'Donnell now incorporates by reference those facts, attached as Exhibit 6.

7.

Pursuant to 29 CFR § 1614.407, Mr. O'Donnell has timely filed this suit against the USMS because 180 days have passed since Mr. O'Donnell filed his charge of discrimination with the USMS's Office of Equal Employment (the "EEO").

8.

Defendants provide services at the Richard B. Russell Federal Building (the "Federal Building"), located in Fulton County and all the conduct alleged in this

3

Complaint happened in Fulton County.  Therefore, Defendants are subject to the jurisdiction and venue of this Court.

## FACTUAL ALLEGATIONS

9.

The USMS is a federal law enforcement agency within the U.S. Department of Justice that is tasked with the protection of officers of the court and providing courthouse security.

10.

Akal is a private company that the USMS has contracted with to provide security to the Federal Building, which houses the Northern District of Georgia's federal courts, as well as many other U.S. government agencies.

11.

 Mr. O'Donnell worked as a Court Security Officer ("CSO") for Defendants for approximately five years before Defendants terminated his employment on January 6, 2017.

12.

At all times material to this action, Mr. O'Donnell was an "employee" of Defendants, as defined by Title VII.

13.

Defendants were joint employers of Mr. O'Donnell by virtue of their shared control over Mr. O'Donnell's employment.  Both Defendants:

a)      had the power to suspend and fire Mr. O'Donnell;

b)      supervised and controlled Mr. O'Donnell's work schedules and conditions of employment;

c)      determined the essential terms and conditions of Mr. O'Donnell's employment; and

d)      had the ability to promulgate Mr. O'Donnell's work rules and assignments.

14.

On or around early 2014, Defendants hired Marquice Robinson as a CSO.

15.

Soon after Mr. Robinson and Mr. O'Donnell became friends.  Their co-workers apparently perceived Mr. Robinson and Mr. O'Donnell as being involved in a homosexual relationship.  The prejudices emerged and Defendants' employees launched a campaign of harassment directed at Mr. Robinson and Mr. O'Donnell based on their sex and gender.

16.

Defendants' employees perceived Mr. O'Donnell as failing to comply with societal stereotypes of how men ought to appear or behave, and as refusing to conform to a male gender stereotype. After Mr. O'Donnell complained of the discrimination, Defendants changed his schedule in violation of the seniority bid system; suspended him without pay; falsely accused him of grabbing Senior Lead CSO Michael Holman; revoked his security clearance at the Federal; removed him from the Defendants' Contract to staff the Federal Building; and terminated his employment. Thus, Mr. O'Donnell's perceived failure or refusal to conform to the male gender stereotype led to discrimination by Defendants. Some examples of the discriminatory acts or comments include:

a. "Which one of you wears the dress?"

b. "Where my girls at?"

c. "Get off his train," referencing male genitalia, and noting their relationship did not look right.

d. Referring to them as "sugar boys," "girlfriends," "married couple," "sissies," and "lovers."

e. "Married couples don't spend as much time together as y'all do."

f. Commenting that Mr. O'Donnell and Mr. Robinson were being targeted

by Defendants' employees for spending too much time together, and that Defendants' employees were talking about their relationship "not looking right" because they are men.

17.

As detailed below, Mr. O'Donnell and Mr. Robinson complained to Defendants that they felt discriminated against because of their sex and gender. In response, Defendants continued the unlawful conduct and retaliated against Mr. O'Donnell for complaining.

a) **In November 2014**, District Supervisor Tom Shell (Akal) called the command center and said (over the speakerphone), "where my girls at – O'Donnell and Robinson?" because Shell did not think O'Donnell or Robinson conformed to male gender stereotypes.

b) **March 12, 2015**, Mr. O'Donnell complained to District Supervisor Tom Shell (Akal) that Lead Special Security Officer Gary Brown told Robinson to get off O'Donnell's "train," while pointing to his own genitalia, a reference to Robinson and O'Donnell having sexual relations as two males.

c) **In August 2015**, Mr. O'Donnell complained to District Supervisor Tom Shell (Akal) and Contract Manager James Tassone (Akal) that Lead Special Security Officer Gary Brown repeatedly made comments that Robinson and

O'Donnell being together did not look right, that men should not spend so much time together, and that married people do not spend as much time together as Robinson and O'Donnell.

d) **In August 2015**, Mr. O'Donnell complained to Deputy U.S. Marshal LeAnn Rucker Reed (the Contract Officer Representative) about District Supervisor Tom Shell (Akal), Lead Special Security Officer Gary Brown, and Senior Lead James Jones for making harassing and disparaging comments, including that Robinson and O'Donnell did not look right as two men who spent so much time together, and that men should not spend so much time alone together.

e) **In October 2015**, Mr. O'Donnell complained to Contract Manager James Tassone (Akal) about District Supervisor Tom Shell (Akal), Lead Special Security Officer Gary Brown, and Senior Lead James Jones, who harassed him in retaliation for filing a formal internal complaint regarding comments from Shell, Brown, and Jones that Robinson and O'Donnell being together did not look right, that men should not spend so much time together, and that married people do not spend as much time together as Robinson and O'Donnell.

f) **In November 2015**, Mr. O'Donnell complained to Contract Manager James

Tassone (Akal) about District Supervisor Tom Shell (Akal). Specifically, Mr. Robinson complained that Shell asked, "which one of you wears the dress?"

g) **By November 2015**, not only were conditions not improving as a result of Mr. O'Donnell's complaints, things were getting worse. Thus, Mr. O'Donnell met with an attorney to file an EEOC charge for sex discrimination, thus further putting Defendants on notice of his concerns. Mr. O'Donnell had a good faith, reasonable belief that Defendants engaged in unlawful employment matters by discriminating against him based on their perception of his sexual orientation.

h) **In March 2016**, Court Security Officer Ricky Meadows, upon encountering Mr. Robinson, said to Mr. Robinson, "I haven't seen you all day, you have probably been with your boyfriend O'Donnell." Robinson told O'Donnell, and O'Donnell complained to District Supervisor Tom Shell (Akal) about this incident, stating he felt harassed, discriminated against, and he felt the work environment was toxic.

i) **From April 2016 to May 2016,** Mr. O'Donnell complained several times to Contract Manager James Tassone (Akal) about District Supervisor Tom Shell (Akal), making inappropriate comments, including comments that the two

should not spend so much time together because it did not look right that two men spend so much time together.

j) **June 14, 2016,** Mr. O'Donnell's counsel sent a letter to Akal detailing issues such as retaliation, sex discrimination, and harassment. Rather than investigate and address the concerns, Defendants retaliated. Specifically, Akal's District Supervisor Tom Shell and Akal's Senior Lead Michael Holman randomly and with little notice changed O'Donnell's schedule to cause him to be late or miss shifts.

k) **July 1, 2016** Akal Compliance Manager Justin Reilly responded to the letter of June 14, 2016, noting the letter was received.

l) **In August 2016**, Mr. O'Donnell complained of harassment (unfair and disparate treatment), retaliation, work place bullying, sex discrimination, and a hostile work environment to Contract Manager James Tassone about District Supervisor Tom Shell and Senior Lead Michael Holman (Akal).

m) **In August 2016,** in retaliation for the preceding complaints, Akal's District Supervisor Tom Shell and Akal's Senior Lead Michael Holman changed Mr. O'Donnell schedule frequently in an effort to harass him and to cause him to violate attendance rules so Defendants could build a case against him.

n) **August 22, 2016,** James Tassone (Akal Contract Manager), Justin Reilly

(Akal Compliance Manager), and Chief Deputy Dawn Anderson (USMS), suspended Mr. O'Donnell without pay.

o) **August 23, 2016**, Akal District Supervisor Tom Shell and Chief Dawn Anderson (USMS) revoked Mr. O'Donnell security clearance at the Federal Building.

p) **In September 2016**, Mr. O'Donnell complained of harassment, retaliation, work place bullying, discrimination and a hostile work environment to USMS Deputy Director David Harlow, USMS Human Resource Director Katherine Mohan, and Assistant Director John Bolen about USMS Chief Deputy Dawn Anderson, Judicial Security Inspector John Devaney, Contract Manager James Tassone, District Supervisor Tom Shell, and Senior Lead Michael Holman. In retaliation, on November 10, 2016, the USMS permanently removed Mr. O'Donnell from the contract with the USMS. The decisionmakers were Chief Deputy Marshal Dawn Anderson (USMS), James Tassone (Akal Contract Manager), and Tom Shell (Akal District Supervisor).

q) **November 21, 2016,** Mr. O'Donnell complained by filing an appeal letter (and a supplemental letter on November 28, 2016) to Akal Employee Relation Manager Josephine Coker appealing the decision to permanently remove him from the contract with the USMS. Mr. O'Donnell complained

that he was being harassed for sex discrimination and retaliated against by Akal Senior Lead Michael Holman and District Supervisor Tom Shell.  Mr. Robins O'Donnell's letter also stated that he filed EEOC complaints against Akal (including Michael Holman and Tom Shell) for sex discrimination and retaliation.  In retaliation for the preceding complaints, on January 6, 2017, Chief Dawn Anderson (USMS), Tom Shell (Akal), and James Tassone (Akal) terminated Mr. O'Donnell's employment.

18.

Rather than investigate the complaints and take appropriate steps to stop the harassment, Akal and the USMS retaliated against Mr. O'Donnell for engaging in protected activity.  All individuals referenced in Paragraph 17 were aware that Mr. O'Donnell filed an EEOC complaint and played a role in his termination by lying, providing false information, and misrepresenting the facts.  It was collaborative effort by them all that lead to Mr. O'Donnell's termination.  Each false disciplinary decision led to the next.

19.

In at least two ways, Tom Shell (Akal) and Michael Holman (Akal) knew Mr. O'Donnell filed an EEOC charge:

1. First, Mr. O'Donnell told Shell that he was going to file an EEOC complaint

in August 2015.

2. Second, Lead Officer McLaurin told Mr. Robinson that Shell and Holman knew that Mr. O'Donnell filed an EEOC complaint in June 2016.

20.

James Tassone (Akal) knew Mr. O'Donnell filed an EEOC complaint because Tassone conducted Akal's internal investigations in August 2016.

21.

Justin Reilly (Akal) knew Mr. O'Donnell filed an EEOC complaint because Reilly was Akal's representative throughout the EEOC complaint process starting in February 2016.

22.

In at least three ways, USMS Chief Dawn Anderson knew Mr. O'Donnell filed an EEOC complaint:

1. First, Chief Anderson was designated as the Responsible Management Official for the USMS in the Northern District of Georgia in this matter.

2. Second, Mr. O'Donnell sent an email to USMS Deputy Director David Harlow and USMS Human Resource Director Katherine Mohan on August 28, 2016 noting that he filed an EEOC complaint against Akal. The USMS responded through Assistant Director John Bolen and Management Analyst

Chris Scalzo of the Judicial Security Division on September 2, 2016, acknowledging that his email was received. Upon information and belief, Harlow and/or Mohan and/or John Bolen spoke with Anderson regarding this EEOC charge, and Anderson decided to retaliate against Mr. O'Donnell.

3. Third, in Mr. O'Donnell's appeal letters (sent November 21 and 28, 2016) appealing the USMS decision to permanently remove him from the contract, he explicitly states that he filed EEOC complaints against Akal.

23.

Mr. O'Donnell continued to make complaints of discrimination and retaliation to Akal and the USMS through the termination of his employment.

24.

In addition to making his own complaints, Mr. O'Donnell actively supported Mr. Robinson in making discrimination and retaliation complaints to Akal and the USMS.

25.

Akal and the USMS have retaliated against Mr. O'Donnell by subjecting him to adverse employment actions, including but not limited to:

a) **Across June 2016 to August 2016**: Changing Mr. O'Donnell schedule weekly in an effort to harass him and cause him to violate time rules so

they could build a case against him.  Akal's District Supervisor Tom Shell and Akal's Senior Lead Michael Holman were the decision makers.

b) **June 20, 2016 to June 23, 2016:** Failing to provide Mr. O'Donnell with breaks and lunches.  Akal's District Supervisor Tom Shell and Akal's Senior Lead Michael Holman were the decision makers.

c) **August 22, 2016**: Suspending Mr. O'Donnell without pay.  James Tassone (Akal Contract Manager), Justin Reilly (Akal Compliance Manager), and Chief Deputy Dawn Anderson (USMS) were the decision makers.

d) **August 23, 2016**: Revoking Mr. O'Donnell's security clearance at the Federal Building.  Akal District Supervisor Tom Shell and Chief Dawn Anderson (USMS) were the decision makers.

e) **November 2016**: Removing Mr. O'Donnell from the Akal/USMS Contract to staff the Federal Building (the "Contract").  The decisionmakers were Chief Deputy Marshal Dawn Anderson (USMS), James Tassone (Akal Contract Manager), Tom Shell (Akal District Supervisor), and Michael Holman (Akal Senior Lead).

f) **January 6, 2017**: Terminating Mr. O'Donnell's employment.  Chief Dawn Anderson (USMS), Tom Shell (Akal), Michael Holman (Akal), and James Tassone were the decision makers.

26.

The effect of Defendants' actions complained of above have been to deprive Mr. O'Donnell of equal employment opportunities and otherwise adversely affect his status as an employee because he engaged in protective activity under Title VII and reported sexual harassment and retaliation.

27.

The unlawful employment practices complained of in Paragraph 21, above, were intentional.

28.

The unlawful employment practices complained of in Paragraph 21, above, were carried out with malice and/or reckless indifference to the federally protected rights of Mr. O'Donnell.

29.

Akal knowingly made untrue and disparaging statements about Mr. O'Donnell to their employees, the USMS, and other third parties.

30.

On August 24, 2016, Akal posted and sent a defamatory memorandum to its employees characterizing Mr. O'Donnell as a security issue.  A copy of the August

24, 2016 memo is attached as Exhibit 1.  Akal knew the statement was false.

31.

On September 30, 2016, Akal sent a defamatory letter to the USMS stating

that on August 8, 2016, Mr. O'Donnell failed "to follow the instructions of CSO

Anderson and ignored the pleas of the contractor to open the [g]ate".  A copy of

Akal's September 30, 2016 letter to the USMS is attached as Exhibit 2.  Akal knew

the statement was false.

32.

On the morning of August 8, 2016, CSO Josh Anderson asked Mr. O'Donnell

to help contractors enter the Courthouse. Mr. O'Donnell informed Mr. Anderson,

who was not a supervisor or lead, that he was unable to help the contractors because

he was assigned to another post and could not abandon his assigned post. Mr.

Anderson did not inform Mr. O'Donnell that the instructions came from a member

of management and communicated to Mr. O'Donnell that he would find another

CSO who was available to assist. Ultimately District Supervisor Tom Shell called

Mr. O'Donnell and instructed him to leave his assigned post to assist the contractors.

As soon as Mr. O'Donnell received permission to leave his post, he assisted the

contractors.  Mr. O'Donnell did not fail to follow the instructions of CSO Anderson

nor did he ignore the pleas of any contractors to open the gate.

33.

On September 30, 2016, Akal sent a defamatory letter to the USMS stating that on August 19, 2016, Mr. O'Donnell abandoned his post, grabbed Lead CSO Michael Holman by the arm, and left work early without permission. A copy of Akal's September 30, 2016 letter to the USMS is attached as Exhibit 3. Akal knew the statements were false.

34.

On August 19, 2016, Mr. Robinson asked Mr. O'Donnell to come down to Mr. Shell's office to act as a witness for Mr. Robinson during his meeting with management, specifically Mr. Holman and Mr. Shell. That day Mr. O'Donnell was assigned to be EP/Rover/Court, a roving post, and therefore had no assigned post for the shift. A copy of Mr. O'Donnell's August 19, 2016 Schedule is attached as Exhibit 4. As a result of Mr. Robinson's request, Mr. O'Donnell walked to Mr. Shell's office. Before Mr. O'Donnell got to Mr. Shell's Office, Mr. Holman struck Mr. Robinson in the face. Mr. Robinson's mouth bled as a result of Mr. Holman's attack. That same day, Defendants scheduled Mr. O'Donnell to leave at 3:15 pm. However, Mr. O'Donnell asked Lead CSO Teressa McLaurin for permission to leave at 3:00 pm. Ms. McLaurin, who is a member of Management gave Mr. O'Donnell permission to leave early.

35.

Akal's defamatory statements regarding Mr. O'Donnell, motivated by illegal retaliation, led directly to Defendants' termination of Mr. O'Donnell's employment.

36.

Mr. O'Donnell submitted multiple letters to Defendants that gave Defendants ample information to know that the defamatory information Akal was providing to the USMS was demonstrably false. Defendants ignored Mr. O'Donnell's letters, failed to conduct any reasonable investigation, and proceeded on the demonstrably false information Akal provided to the USMS.

37.

As a direct result of Akal's false statements, the USMS deactivated Mr. O'Donnell's access to the Federal Building and required that he be escorted by a Deputy U.S. Marshal while on the premises.

38.

The USMS, purporting to rely on Akal's defamatory statements, directed Akal to remove Mr. O'Donnell from the Contract.  A copy of the USMS's November 9, 2016 letter directing Akal to remove Mr. O'Donnell from the Contract is attached as Exhibit 5.  By the time the USMS directed Akal to remove Mr. O'Donnell, the USMS had ample information to know that the Akal information was unreliable.

39.

Akal terminated Mr. O'Donnell's employment, citing as the reason, the USMS's direction to remove Mr. O'Donnell from the Contract.

40.

Based on the foregoing, Mr. O'Donnell's ability to make job inquiries at the various enforcement agencies housed in the Federal Building is effectively eliminated.

41.

On July 26, 2017, per O.C.G.A. § 51-5-11, Undersigned Counsel sent Akal a written demand to retract any defamatory statements Akal has made about Mr. O'Donnell.

42.

As of the date of the filing this Complaint, Akal has not retracted its statements about Mr. O'Donnell.

43.

Mr. O'Donnell suffered and continues to suffer damages because of Defendants' actions.

## COUNT ONE:
## RETALIATION IN VIOLATION OF TITLE VII
### (Akal and the USMS)

44.

Mr. O'Donnell realleges and incorporates Paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45.

Mr. O'Donnell engaged in protected activity by complaining to Defendants about discrimination by Defendants on the basis of his sex, retaliation, and his active support of Mr. Robinson's discrimination and retaliation complaints to Defendants.

46.

Because of the Complaints, Defendants took adverse actions against Mr. O'Donnell by subjecting him to different terms and conditions of his employment than those imposed on similarly situated co-workers who did not engage in protected activity, up to and including terminating Mr. O'Donnell's employment.

47.

Defendants unlawfully retaliated against Mr. O'Donnell, in violation of Title VII.

48.

The USMS is jointly and severally liable for the retaliation because the USMS

participated in, condoned, and encouraged the retaliation.

49.

Defendants' retaliatory acts would dissuade a reasonable person from making or supporting a charge of discrimination and, thus constitute interference with Mr. O'Donnell's federally protected rights.

50.

Defendants retaliatory conduct towards Mr. O'Donnell was intentional, deliberate, willful, malicious, reckless, and wanton, entitling Mr. O'Donnell to punitive damages.

51.

As a result of the unlawful retaliation to which Defendants subjected Mr. O'Donnell, Mr. O'Donnell has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss.

52.

As a result of Defendants' retaliation, Mr. O'Donnell is entitled to all legal and equitable remedies available for violations of Title VII, including but not limited to an award of punitive damages and attorneys' fees.

## COUNT TWO:
## DEFAMATION
## (Akal)

53.

Mr. O'Donnell realleges and incorporates Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.

Akal made false and defamatory statements concerning Mr. O'Donnell, including but not limited to those set forth above.

55.

Akal's defamatory comments were made intentionally and/or negligently.

56.

Akal communicated and/or published its false statements to third parties without any special privilege or legal justification to do so.

57.

Mr. O'Donnell requested in writing that Akal retract its defamatory statements and Akal has failed to retract those statements within seven days of receipt of the request. Thus, Mr. O'Donnell is entitled to an award of punitive damages against Akal to punish it and to deter it from ever again engaging in the kind of conduct described, herein.

58.

As a result of the statements made by Akal, Mr. O'Donnell has lost his employment and is unable to make job inquiries at the various enforcement agencies housed in the Federal Building.

59.

Akal's defamation has caused Mr. O'Donnell harm in an amount to be proven at trial.

60.

Because Akal's conduct was intentional, deliberate, willful, malicious, reckless, and wanton.  Thus, Mr. O'Donnell is entitled to punitive damages to punish Akal and to deter it from engaging in similar conduct in the future.

## COUNT THREE:
## FALSE LIGHT INVASION OF PRIVACY
## (Akal)

61.

Mr. O'Donnell realleges and incorporates Paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62.

Akal publicized that Mr. O'Donnell was a security threat.  Akal knew the publicity was false.  Mr. O'Donnell has never been a security threat.

63.

Akal intentionally and/or negligently made public disclosures depicting Mr. O'Donnell in a false light.

64.

Akal made its false publicity to third parties without any special privilege or legal justification to do so.

65.

Akal's false publicity placed Mr. O'Donnell in a false light that would be highly offensive to a reasonable person.

66.

Akal's false publicity has caused Mr. O'Donnell harm in an amount to be proven at trial.

67.

Because Akal's conduct was intentional, deliberate, willful, malicious, reckless, and wanton.  Thus, Mr. O'Donnell is entitled to punitive damages to punish Akal and to deter it from engaging in similar conduct in the future.

## COUNT FOUR:
## ATTORNEYS' FEES
## (Akal and the USMS)

68.

Mr. O'Donnell incorporates and re-alleges paragraphs 1 through 67 as if fully set forth herein.

69.

Defendants have acted in bad faith, been stubbornly litigious, and caused Mr. O'Donnell unnecessary trouble and expense, entitling Mr. O'Donnell to an award of expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.  All conditions precedent to Mr. O'Donnell's entitlement to the remedies he seeks have been satisfied or waived.

70.

Defendants have asserted a defense/position with respect to which there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept Defendants' defense/position, entitling Mr. O'Donnell to an award of expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 9-15-14.  All conditions precedent to Mr. O'Donnell's entitlement to the remedies he seeks have been satisfied or waived.

71.

Defendants have asserted a defense that lacked substantial justification, was interposed for delay or harassment, and has unnecessarily expanded this proceeding, entitling Mr. O'Donnell to an award of expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 9-15-14.  All conditions precedent to Mr. O'Donnell's entitlement to the remedies he seeks have been satisfied or waived.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. O'Donnell prays for the following relief:

(a)     That Defendants be served with process and be required to answer this lawsuit;

(b)     For a trial by a jury;

(c)     For a Judgment in favor of Mr. O'Donnell and against Defendants for all damages allowed by law, including but not limited to actual damages, liquidated damages, nominal damages, and punitive damages;

(d)     For an award of back pay, lost benefits, and other damages for lost compensation and job benefits;

(e)     For an award of litigation expenses and costs, including attorneys' fees; and

(f)     For such other and further relief as this Court deems just and proper.

Respectfully submitted this 2nd day of July, 2018.

**COHAN LAW GROUP, LLC**

***/s/ Louis R. Cohan***
LOUIS R. COHAN
Georgia Bar No. 173357
ELLIS C. LIU
Georgia Bar No. 443689
*Attorneys for Plaintiff*

3340 Peachtree Road NE, Suite 2570
Atlanta, Georgia 30326
(404) 891-1770 (telephone)
(404) 891-5094 (facsimile)
lcohan@cohanlawgroup.com
eliu@cohanlawgroup.com

I certify that the foregoing has been prepared in Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

**COHAN LAW GROUP, LLC**
*/s/ Louis R. Cohan*
Louis R. Cohan

## CERTIFICATE OF SERVICE

I hereby certify that I have served all parties with the foregoing ***Plaintiff's First Amended Complaint*** by filing with the Court's CM/ECF system, which will automatically serve the following attorneys of record:

LITTLER MENDELSON, P.C.

Kurt Peterson

3344 Peachtree Rd., NE, Suite 1500

Atlanta, GA 30326

kpeterson@littler.com

(404) 233-0330 (telephone)

(404) 233-2361 (facsimile)

*Attorneys for Defendant Akal Security, Inc.*

BYUNG J. PAK,  UNITED STATES ATTORNEY

Lisa D. Cooper

600 Richard B. Russell Federal Bldg.

75 Ted Turner Drive, S.W.

Atlanta, Georgia 30303

(404) 581-6249 (tel)

(404) 581-4667 (fax)

*Attorneys for Defendant The United States Marshals Service*

This 2nd day of July, 2018.

**COHAN LAW GROUP, LLC**

***/s/ Louis R. Cohan***

_____

LOUIS R. COHAN

Georgia Bar No. 173357